IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| A.D., a minor, by NICOLE FINNEY, as guardian and in her own right,<br>    Plaintiffs,<br><br>    vs.<br><br>SHUMAN JUVENILE DETENTION CENTER, a Department of Allegheny County, Pennsylvania,<br>    Defendant. | Civil Action No. 05-1323<br>Judge Cercone<br>Magistrate Judge Mitchell |

REPORT AND RECOMMENDATION

I.  Recommendation

It is respectfully recommended that the motion for summary judgment submitted on behalf of the defendant (Docket No. 17) be denied.

II. Report

Plaintiffs, A.D., a minor, by Nicole Finney as guardian and Nicole Finney (A.D.'s mother) in her own right, bring this civil rights action against Defendant, Shuman Juvenile Detention Center, a Department of Allegheny County, Pennsylvania ("Shuman"). The complaint alleges that several of Defendant's employees unlawfully and intentionally assaulted and forcibly restrained A.D. on March 27, 2005, when he was dropped off at Shuman by his father for what his father believed to be a "scared straight" program.

Presently before this Court for disposition is a motion for summary judgment brought by the Defendant. For the reasons that follow, this motion should be denied.

Facts

On March 27, 2005, Plaintiff A.D., then age 13, was dropped off by his father at Shuman

for what the father believed would be a "scared straight tour." A.D. had not committed any crime and had not been ordered to Shuman by any tribunal or administrative agency. Rather, A.D.'s father believed that he had been misbehaving at school and being disrespectful and he wanted to use the example of the detainees at Shuman to persuade A.D. away from this behavior.

Plaintiffs allege that, after A.D. was dropped off, several guards took him inside the facility and ordered him to disrobe. When he refused, a guard tried to knock him to the ground. Four guards then pulled him to the floor and one of the guards pressed his fist into A.D.'s chest to restrain him. The guards then took him to a cell where they removed his jeans and forced him to remove his own sweater. (Compl. ¶¶ 10-12.)

The guards then gave A.D. a Shuman uniform which he was forced to wear, gave him a bar of soap and a toothbrush and ordered him to clean the cell's toilet and sink. Guards cursed, yelled and spit at A.D. and threatened him by telling him that if he fought back, he would be kept at Shuman for forty-eight hours. They also released two detainees out of their cells to taunt A.D. He was permitted to leave when his father returned. (Compl. ¶¶ 13-17.)

Procedural History

Plaintiff filed this action on September 22, 2005. Counts I-V allege claims for violations of Plaintiff A.D.'s civil rights under the Fourth and Fourteenth Amendments to the Constitution and they are brought pursuant to 42 U.S.C. § 1983. Specifically, Plaintiffs allege that Defendant's employees unreasonably seized A.D. (Count I), subjected A.D. to unreasonable force (Count II), violated his right to due process (Count III), violated his substantive due process right to privacy (Count IV) and falsely arrested him (Count V). Counts VI-IX alleged state law claims by Plaintiff A.D., specifically: assault (Count VI), battery (Count VII), false imprisonment

(Count VIII), and intentional infliction of emotional distress (Count IX).  Finally, Count X alleged that Defendant's employees deprived Nicole Finney of her right to the services, comfort and happiness of the society of her son.

On September 27, 2005, a partial motion to dismiss was filed by Defendant.  It sought dismissal of the state law claims in Counts VI-X.  On February 9, 2006, an order was entered (Docket No. 7), granting the motion and dismissing Counts VI-X, based upon a Report and Recommendation filed on January 4, 2006 (Docket No. 6).  Thus, only the federal civil rights claims in Counts I-V remain.  On September 13, 2006, Defendant filed a motion for summary judgment.

Standard of Review

Summary judgment is appropriate "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Woodside v. School Dist. of Philadelphia Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001) (quoting Foehl v. United States, 238 F.3d 474, 477 (3d Cir. 2001) (citations omitted)).  In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor.  Doe v. County of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001); Woodside, 248 F.3d at 130; Heller v. Shaw Indus., Inc., 167 F.3d 146, 151 (3d Cir. 1999).

When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing'–that is, pointing out to the District Court–that there is an absence of evidence to support the non-moving party's case." Celotex Corp. v. Catrett, 477

U.S. 317, 325 (1986). If the moving party has carried this burden, the burden shifts to the non-moving party who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1230 (3d Cir. 1993).

<u>Municipal Liability for Section 1983 Claims</u>

It is provided in 42 U.S.C. § 1983 that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

Thus, to establish a claim under this statute, "a plaintiff must demonstrate a violation of a right protected by the Constitution or laws of the United States that was committed by a person acting under color of state law." Nicini v. Morra, 212 F.3d 798, 806 (3d Cir. 2000) (en banc). In addition, the Supreme Court has long held that:

> A local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

Monell v. New York City Dep't of Social Servs., 436 U.S. 658, 694 (1978). "Policy is made when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." Kniepp v. Tedder, 95 F.3d 1199, 1212 (3d Cir. 1996) (citation omitted). Customs are "'practices of state officials ... so permanent and

well settled' as to virtually constitute law." Id. (quoting Monell, 436 U.S. at 691). Finally, the plaintiff must "demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." Board of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 404 (1997).

Defendant argues that it is entitled to summary judgment because there was no "policy" of conducting "scared straight tours" at Shuman. In fact, it contends that Shuman has long had a policy of not allowing such tours. Thus, it argues that the employees who allegedly committed the actions that led to this case were acting on their own and not pursuant to a policy such that liability could be imposed on Shuman.

> The 1987 policy set the following procedures with respect to tours:
>
> (1) Approval must be given by the Director or his designee.
> (2) A staff person appointed by the administration will conduct tours.
> (3) Requests for tours must be made to the Chief Supervisor in charge of community relations or to the Director, and include specific date and time and reason for the tour.
> (4) Tours will be limited to times convenient to the center.
> (5) Tours will exclude minors under twelve years of age, unless special permission is given by the Director.
> (6) Tours will be confined to the entrance area, rotunda, school (when not in session), chapel, B offices, recreation areas, wood shop, cafeteria and one unoccupied resident area.

(Drawn-Williamson Dep. Ex. 2.)[1]

A July 3, 2002 email, sent by Director Alex Wilson to numerous Shuman employees, stated that:

> This email is a revision of the one sent to you yesterday. Item #4 is new and not in yesterday's email.

---

[1] Docket No. 18 Ex. 2.

> This email is specifically for wing and chief supervisors. On June 9th two youths were brought to Shuman for a tour of the building. They were made to change into [S]human center clothing and then sent to spend time in a living unit. A number of things occurred that turned this matter into a nightmare situation, but its [sic] not important at this point to go into detail about, however, I want to stress the following points:
>
> 1. In the future when youth are brought to Shuman for a tour by their parents, or whomever has legal custody, they are **never** allowed to change into and wear Shuman clothing.
>
> 2. Youth care staff (or supervisors) are not allowed to berate youth on tours with "in your face" verbal confrontations. These things can at times be taken too far and may be inappropriate even if the intention is to "scare them straight."
>
> 3. I don't want us to even use the term "scared straight." I think the term gives people a wrong perception of what we do with youth here in the facility.
>
> 4. All tours should be coordinated through Chief Supervisor Pipkin. Staff are not permitted to make special arrangements for friends, relatives etc. to have kids brought up for a tour without first contacting Chief Pipkin so that he can arrange for the tour. There are to be no exceptions to this policy.

(Drawn-Williamson Dep. Ex. 3.)

> A policy dated July 1, 2005 states that it:
>
> establishes the procedure for conducting tours of the facility. Most tour requests are for groups of two or more individual[s]; however, a request may be made for a single individual. Also, with respect to this policy we **do not** conduct what is commonly known as "scared straight" tours. No employee is allowed to physically restrain or berate a youth on tour with "in your face" verbal confrontations, and at no time will any non-resident youth be permitted to wear Shuman Center clothing. This policy applies to all employees as well as outside visitors. There will be no exceptions to this policy. Any person who violates this policy will be subject to discipline which may include but [is] not limited to written reprimand, suspension or termination.

(Drawn-Williamson Dep. Ex. 4.)

Lynette Drawn-Williamson, the Deputy Director Shuman (Drawn-Williamson Dep. at 6), stated at her deposition that Shuman had a policy dating back to January 1987 regarding how and

6

when tours would take place (id. at 35); that this policy was contained in the Shuman Operations Manual, the policies of which are given to all new staff and was reviewed in monthly conferences with the youth care workers (id. at 35-38, 64, 81), and that the July 2002 policy that specifically prohibited "scared straight" tours sent by email was not a new policy but a reinforcement of the existing one or of items that were implicit in the prior policy (id. at 58-62). She stated that the July 2002 policy required that requests for tours be in writing, whereas prior to that time many requests were in writing, but this was not required. (Id. at 77.)

She testified that the tour that occurred with A.D. on March 27, 2005 was not authorized (although it had been authorized for a previous date and it was canceled and not rescheduled), that the youth care workers involved were not authorized to conduct tours, that she investigated the incident that occurred and that, as a result, she indefinitely suspended the five individuals involved. (Id. at 51-54, 69.)

However, Plaintiffs have proffered testimony given at the criminal trial against the individuals involved in the alleged harassment of A.D. On August 9-10, 2006, a bench trial was conducted before Judge Cashman. At the trial, Alex Wilson, the Director of Shuman, was asked whether a youth who arrived at Shuman along with a guard would be buzzed in, and he said "[i]t could possibly happen." (Docket No. 20 Ex. 1 at 100.) He also stated that Mr. Ginyard (one of the individuals involved in the incident) signed a statement that he received the policy in July 2002 but that he could not produce any signatures from other employees demonstrating that they had received the policy. (Id. at 107-08.)

Charles Smith, one of the youth care workers involved in the incident, testified that, contrary to the written policies submitted by Shuman, he insisted that all youths of Shuman age

7

who arrive at the facility (such as A.D.) be patted down, searched and required to remove their shoes and socks as part of the tours. (Id. at 187-89.) When asked whether putting A.D. in Shuman clothes was against the rules, he said:

> They always put students in clothes. Most tours, most private tours come in, they are put in uniforms. We have supervisors who put residents in uniforms, they do tours. They put them in uniforms, this is the procedure. This is the thing they do every day. On different tours, if you get a tour coming from Clayton Elementary, you don't take 15 kids and put them in uniforms, but you do one-on-one tours. Usually that person is on the tour, is put in a Shuman uniform and then taken to the unit. Maybe two different units to see what it's like and see these are the kids, that's where you're going to eat and sleep at. These are the things you have to do to keep your room clean. They are shown pictures, the whole nine yards.

(Id. at 193.)

Smith was asked if he knew that it was against the rules to "get into a resident's face" and scream and he said "[t]here's no such rule at Shuman Center." (Id. at 199.) When shown the written policy prohibiting this behavior, he said: "I never seen that particular conference, I never had that conversation. I never signed that conversation. As far as I'm concerned, I never seen that." (Id. at 200.) He added: "Those types of things happen at Shuman Center every day." (Id.)

Lynn Barker, a former supervisor for the entire facility who worked at Shuman for over ten years until he left around October 2004 (id. at 132), testified that he conducted 1200 "scared straight tours" over the years, that Mr. Wilson and Mr. Pipkin were aware of this, and that the purpose was as follows:

> The purpose of the tour was to a group of students, to show them what Shuman Center was. An individual tour was to scare young people, either male or female, that if they didn't listen to their parents of do what they were told, this was an alternative to a place they could end up. We made it very clear to them what would happen when they arrived at Shuman Center.

(Id. at 126-28.) Mr. Barker further testified that it was customary to put youths on tours into

8

Shuman uniforms:

> Up until two days before I left ... I did a tour the Thursday before I left. I was instructed by Mr. Wilson to do the tour. I said "uniform" in the unit, he said "absolutely." He told me to be very enthusiastic.

(Id. at 129.)

Mr. Barker testified that the policy on tours never changed (id. at 132), that he never signed anything (id. at 133) and that, regardless of what the paper shown to him appeared to say:

> The policy never changed. What they did is they changed the wording of the policy. It went from scare[d] straight tours to tours but it was still the same. Two days before I left Shuman Center, the Deputy Director of Shuman Center said we had to do a tour the old fashion[ed] way.

(Id. at 133.) He further stated that:

> The only thing that changed was the wording. They put Mr. Pipkin in charge of the bigger tours. As far as the individual thing, when he was busy, he had myself and Mr. Dexter do the tours. I continued to do the exact same tour that I had done since I became a supervisor in September of '95. It never changed. When they [the youths] walked out of the building, they knew when they were going to get it.

(Id. at 132-34.) He also stated that he would get residents to confront the youths brought in for tours and "get in their face." (Id. at 135.)

As noted above, a custom is "an act 'that has not been formally approved by an appropriate decisionmaker,' but that is 'so widespread as to have the force of law." Natale v. Camden County Correctional Facility, 318 F.3d 575, 584 (3d Cir. 2003) (quoting Brown, 520 U.S. at 404). Thus, even if an official written "policy" appears to prohibit certain behavior, if a plaintiff can demonstrate that the behavior was tolerated and condoned by policy-making officials, municipal liability can be established. See Huffman v. City of Prairie Village, Kan., 980 F. Supp. 1192, 1205 (D. Kan. 1997) (city had official policy prohibiting sexual harassment,

9

but plaintiff presented evidence that such conduct was widespread in police department and that policy-making officials were aware of it).

Plaintiffs have pointed to the existence of a genuine issue of material fact as to whether, despite the apparent written policy prohibiting "scared straight tours," they were nevertheless carried out as a custom with the knowledge and approval of policy-making officials.  Therefore, Defendant's motion for summary judgment on the ground of the lack of a basis for municipal liability should be denied.

For these reasons, it is recommended that the motion for summary judgment submitted on behalf of the defendant (Docket No. 17) be denied.

Within thirteen (13) days after being served, any party may serve and file written objections to the Report and Recommendation. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

Respectfully submitted,

s/Robert C. Mitchell
Robert C. Mitchell
United States Magistrate Judge

Dated: October 11, 2006